IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

DARLENE W.,[1]                        )
      Plaintiff,                 )        Civil Action No. 3:20-cv-00061
                   )
v.                                    )        REPORT & RECOMMENDATION
                   )
KILOLO KIJAKAZI,                      )        By:    Joel C. Hoppe
Acting Commissioner of Social Security,  )        United States Magistrate Judge
      Defendant.[2]             )

Plaintiff Darlene W. asks this Court to review the Commissioner of Social Security's

final decision denying her application for disability insurance benefits ("DIB") under Title II of

the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral

under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings,

and the applicable law, I find that the Commissioner's decision is supported by substantial

evidence. Accordingly, I respectfully recommend that the presiding District Judge affirm the

decision.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for the former Commissioner, Andrew M. Saul, as
the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Darlene applied for DIB in December 2017. Administrative Record ("R.") 209–10, ECF No. 14. She alleged disability as of October 31, 2017, because of the following impairments: back problems, hand/wrist/arm problems, knee problems, high blood pressure, shoulder problems, insomnia, anxiety, depression, post-traumatic stress disorder ("PTSD"), and hypoglycemia. *Id.*; R. 224. Disability Determination Services ("DDS"), the state agency, denied her claim initially in June 2018, R. 90–105, and upon reconsideration that November, R. 106–124. In September 2019, Darlene appeared with counsel and testified at an administrative hearing before ALJ H. Munday. *See* R. 47–65. During that hearing, she moved to amend her alleged disability onset date to January 25, 2019, R. 50; *see* R. 205, and ALJ Munday granted that request, R. 19. A vocational expert ("VE") also testified at this hearing. *See* R. 60–64.

ALJ Munday issued an unfavorable decision on October 9, 2019. *See* R. 19–36. She found that Darlene had not engaged in substantial gainful activity since January 25, 2019, and that she suffered from "severe" impairments of obesity, sacroiliac joint dysfunction, degenerative disc disease, depression, anxiety, and PTSD. R. 22. None of Darlene's "severe" impairments met

3

or medically equaled any relevant Listing. R. 22–27 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 12.04, 12.06, 12.15).

ALJ Munday then evaluated Darlene's residual functional capacity ("RFC") and determined that she could perform a reduced range of "light" work[4]:

> except stand and walk a total of 4 hours in an 8-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; never climb ladders/ropes/scaffolds; occasional exposure to vibrations; occasional exposure to hazardous conditions, including unprotected heights and moving machinery; able to perform simple, routine tasks; no work at fixed production rate pace; frequent interaction with the general public.

R. 27. Based on this RFC finding and the VE's testimony, ALJ Munday found that Darlene was unable to perform her past relevant work, R. 33, but that she could perform the requirements of certain "light" unskilled jobs existing in significant numbers in the national economy, R. 34, including routing clerk, storage facility rental clerk, and photocopy machine operator, R. 35 (citing R. 62–63). Thus, she found Darlene was "not disabled" from January 25, 2019, through the date of her decision. R. 35. The Appeals Council declined to review that decision, R. 1–7, and this appeal followed.

## III. Discussion

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "The full range of light work" requires the ability to "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983). An RFC that allows the claimant to lift up to twenty pounds, but restricts total standing and walking to fewer than six hours during an eight-hour day is often characterized as permitting a "reduced" or "limited" range of light work because the person's capacities for standing/walking fall between what is needed to do "sedentary" work and what is needed to perform the "full range of light work." *Neal*, 2010 WL 1759582, at *2 (explaining that a four-hour standing/walking restriction "exceed[s] the definition of sedentary work" because it permits the claimant to "stand or walk for more than two hours per workday," but "fall[s] short of the full range of light work because [the claimant] cannot stand or walk for six hours per workday"); *see Moore v. Comm'r of Soc. Sec. Admin.*, No. 5:16cv184, 2018 WL 993879, at *3 (N.D. W. Va. Feb. 21, 2018) ("[T]he ALJ appropriately found the plaintiff to be capable of performing a 'limited range' of light work, limited specifically in that she could stand and walk for no more than four hours.").

4

Darlene raises two arguments on appeal. First, she contends that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ "improperly considered the opinion of treating physician, John Carpenter, M.D." Pl.'s Br. 12, ECF No. 16. She also challenges the ALJ's finding that her cane was not "medically necessary." *Id.* at 15–16.[5] Her arguments are not persuasive.

A.    *The ALJ's Decision*

ALJ Munday found that Darlene had the "severe" impairments of obesity, sacroiliac joint dysfunction, degenerative disc disease, depression, anxiety, and PTSD. R. 22.

In determining her RFC, ALJ Munday summarized Darlene's subjective statements regarding her symptoms,[6] R. 27–28, considered the imaging studies and treatment notes, R. 28–29, and evaluated the medical opinion evidence of record, R. 30–33. In considering Dr. Carpenter's opinions, ALJ Munday accurately summarized their substance, but found them "generally unpersuasive" for several reasons. R. 32. First, Dr. Carpenter's own "examinations report generally normal or unremarkable findings." *Id.* Next, Dr. Carpenter's opinions were "not supported" by an "appropriate explanation" as to his findings. *Id.* ("In essence, Dr. Carpenter does not explain his medical opinions."). Dr. Carpenter's opinions also were "not entirely consistent with the other evidence of record." *Id.* Further, "[n]o other doctors submitted medical opinions indicating [Darlene] is as limited," and Dr. Carpenter "appear[ed] to have relied on the subjective report of symptoms and limitations provided by [Darlene], rather than on objective findings." *Id.* Lastly, Darlene's December 2015 lumbar radiograph "demonstrated mild anterior

---

[5] A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted).

[6] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. § 404.928(a).

osteophytes at L1-L2 through L3-L4 without significant disc height loss at any level within the

lumbar spine," and although her July 2017 cervical CT scan "showed moderate disc space

narrowing and osteophytes at C5-C6," it was "negative for any evidence of acute osseous injury

and otherwise entirely normal." *Id.*; R. 333, 686–87.

ALJ Munday found the opinions of the DDS medical experts "generally persuasive,"

noting "their findings and opinions are generally consistent with and supported by the objective

evidence of record under their review, although they did not have access to later evidence

requiring additional limitations," R. 33, including on Darlene's abilities to stand and walk

throughout the day.

With respect to Darlene's cane use, ALJ Munday acknowledged that she "was prescribed

a four-point quad cane on January 25, 2019, by her pain management specialist (after seeing her

present at the visit with a borrowed single-point cane)." R. 29. She found that the need or use of

a cane was "not medically necessary", however, because Darlene's "gait was generally normal,

and there are very few instances of the claimant using a quad cane on physical exams." *Id.*

The ALJ concluded that Darlene maintained an RFC to perform a limited range of "light"

work. R. 27. Specifically, she could stand and walk for at most four hours in an eight-hour day;

occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; could never climb

ladders, ropes, or scaffolds; could tolerate occasional exposure to vibrations and hazardous

conditions; could perform simple, routine tasks; could not perform work at a fixed production

rate pace; and could frequently interact with the public. *Id.*

B.    *Analysis*

Darlene first argues that ALJ Munday erred in finding Dr. Carpenter's medical opinions

"generally unpersuasive." *See generally* Pl.'s Br. 12–15. For claims filed after March 27, 2017, a

"medical opinion" is a statement from a "medical source" about what a claimant can do despite her impairments and whether one or more impairments causes limitations or restrictions in her ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ must adequately explain whether and to what extent every medical opinion in the record is persuasive. *See id.* § 404.1520c(b). The regulations instruct that supportability and consistency are "the most important factors" and that the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. *See id.* § 404.1520c(b)(2), (c)(1)–(2). The ALJ may, but is not required to, explain how he or she considered other factors, including the medical source's specialization and relationship with the claimant. *Id.* § 404.1520c(c)(3)–(5).

I begin the analysis with a review of Dr. Carpenter's opinions. In June 2018, Dr. Carpenter opined that that Darlene could not "work with her current medical issues and prognosis is guarded as no significant improvement in over 10 yrs." R. 668. In August 2018, Dr. Carpenter filled out a Physical Assessment form for Darlene. R. 656–57. He found Darlene's symptoms from her chronic low back pain and right sciatica were "constantly" "severe enough to interfere with the attention [and] concentration required to perform simple work-related tasks[.]" R. 656. He also found she would be required to recline or lie down in excess of the three breaks allowed in an ordinary workday; she could walk less than one city block without needing to rest or experiencing significant pain; she could stand/walk and sit for zero hours each in an eight-hour workday; and she would require unscheduled fifteen-minute breaks every fifteen minutes.

*Id.* Dr. Carpenter determined Darlene could "never" lift or carry any amount of weight, she was unable to use either hand to grasp, turn, or twist objects, she could not use her fingers for fine manipulation at all, she and could not use either arm for reaching. *Id.* He also found she needed to miss more than four days a month from work because of her impairments or treatment. R. 657.

Dr. Carpenter filled out a Mental Capacity Assessment form that same day. R. 658–60. With respect to understanding, remembering, or applying information, he found Darlene had no limitations in her ability to follow one- or two-step oral instructions; "mild" limitations in her ability to recognize a mistake and correct it or identify and solve problems; and "moderate" limitations in her abilities to sequence multi-step activities and use reason and judgment to make work-related decisions. R. 658. Asked specifically to "describe the medical/clinical findings that support this assessment," Dr. Carpenter wrote: "Losing keys, locks self out of house, puts shirt on backwards." *Id.* Regarding concentrating, persisting, and maintaining pace, Dr. Carpenter found that Darlene had "moderate" limitations in her abilities to initiate and perform a task she knows how to do, ignore and avoid distractions while working, and work close to or with others without interrupting or distracting them; "marked" limitations in her ability to sustain ordinary routine and regular attendance at work; and "extreme" limitations in her abilities to work at an appropriate and consistent pace, complete tasks in a timely manner, and work a full day without needing more than the allotted number or length of rest periods during the day. R. 659. In the space provided to describe the "medical/clinical findings" that supported these limitations, Dr. Carpenter wrote: "Her anxiety persists to extreme degree, worsened by back pain, poor control despite meds & counseling." *Id.* For adapting and managing oneself, he found that Darlene had "mild" limitations in her abilities to distinguish between acceptable and unacceptable work performance, maintain personal hygiene and attire appropriate to a work setting, and  be aware of

normal hazards and take appropriate precautions; "moderate" limitations in her abilities to adapt

to changes, set realistic goals, and make plans independently of others; and "marked" limitations

in her ability to manage her psychologically based symptoms. *Id.* Describing the purported

"medical/clinical findings" that supported those limitations, Dr. Carpenter wrote: "She notes

difficulty with home tasks, feels she needs an aide." *Id.* In interacting with others, Dr. Carpenter

opined that Darlene had "mild" limitations in her abilities to cooperate with others, ask for help

when needed, understand and reply to social cues, and respond to requests, suggestions,

criticism, correction, and challenges; and "moderate" limitations in her abilities to handle

conflicts with others and keep social interactions free of excessive irritability, sensitivity,

argumentativeness, or suspiciousness. R. 660. He listed Darlene's minimal "social interaction,

difficulty with relationships, and feel[ing] suspicious of others" as the "medical/clinical findings"

that supported these broad functional limitations. *Id.* Lastly, Dr. Carpenter wrote in a March

2019 "To Whom it May Concern" letter that Darlene's "anxiety disorder causes permanent

disability," and that she was "no longer able to carry out the duties" of her past work as a

correctional officer. R. 701.

      In challenging the ALJ's treatment of Dr. Carpenter's medical opinions, Darlene asserts

that the ALJ's reasons for finding Dr. Carpenter's opinions "generally unpersuasive" are

"inconsistent," Pl's Br. at 12, and that, "an ALJ should find a medical opinion as persuasive if

the objective medical evidence of record bolsters it," *id.* at 13. She further contends that the ALJ

made no specific findings as to the consistency and supportability of Dr. Carpenter's opinions, as

required by 20 C.F.R. § 404.1520c, aside from the general statement that they were "not entirely

consistent with" the record. *Id.* at 14. Further, she argues that ALJ Munday improperly rejected

Dr. Carpenter's opinion because of its "check box" format. *Id.*

As discussed above, the regulations require that the ALJ explain how she considered the consistency and supportability of the medical opinion and why—based on the evidence—the ALJ reached the particular conclusion she did as to the persuasiveness of the opinion. *See* 20 C.F.R. § 404.1520c(a)–(b). ALJ Munday satisfied that standard here.

The ALJ did not merely state that Dr. Carpenter's opinions were "generally unpersuasive" without stating why. She explicitly articulated how she considered both of the "most important" factors. With respect to supportability, the regulations instruct that, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 1520c(c)(1). In finding Dr. Carpenter's opinions "generally unpersuasive," ALJ Munday first observed that the objective medical evidence from Dr. Carpenter's own examinations showed "generally normal or unremarkable findings." R. 32. The ALJ could properly discredit Dr. Carpenter's opinions for lack of support if his own treatment notes do not support his findings. *See Stanley v. Astrue*, No. 2:06cv61, 2007 WL 4224734, at *7 (W.D. Va. Nov. 28, 2007) ("[B]ecause Dr. Spangler's opinion was not supported by his own findings, the ALJ correctly afforded it less weight."); *Mary R. v. Saul*, No. 3:19cv903, 2021 WL 388463, at *6 (E.D. Va. Jan. 19, 2021) (finding that an ALJ adequately addressed the supportability factor when the ALJ found that a medical provider's opinion "was less supported because [the provider] found extreme limitations even though he observed [the plaintiff] to be cooperative with good eye contact").

A review of the treatment notes shows ALJ Munday could reasonably conclude that Dr. Carpenter's examination findings do not support the extreme limitations in his medical opinions. Dr. Carpenter's treatment notes from 2015 to 2017 document examination findings of lumbar

tenderness, normal strength, slow gait, anxiety, and normal mood and affect. *See, e.g.*, R. 452,
455, 458, 463, 467, 471, 475, 483, 487, 491, 499, 503. Darlene worked full-time during much of
this period, suggesting that her lumbar tenderness, slow gait, and anxiety were not disabling
before her original alleged onset date. *See McDilda v. Barnhart*, No. 6:04cv36, 2005 WL
831253, at *5 (W.D. Va. Apr. 8, 2005) ("Absent a showing of significant deterioration, McDilda
cannot claim disability based on medical conditions she experienced while working.") (citing
*Craig v. Chater*, 76 F.3d 585, 596 n.7 (4th Cir. 1996)).

In January 2018, Darlene reported that she had head and neck pain and anxiety. R. 506,
680. Exam findings showed tenderness to palpation of her forehead, neck, shoulders, low back,
and knees; anxious, cooperative mood; and fair judgment. R. 508. By March 12,  tenderness was
noted only in Darlene's right low back, and she had "much less anxiety." R. 512; *see also* R. 668
(tenderness in right low back radiating down right leg; cooperative, tearful, anxious mood; in
pain; fair judgment) (June 28, 2018). In May 2019, Dr. Carpenter noted that Darlene was in
"moderate" pain and she had decreased range of motion ("ROM") with right shoulder abduction;
pain with right shoulder flexion, extension, and abduction; tenderness in right low back with
radiation down right leg; normal movement; anxious, cooperative mood, and fair judgment. R.
873. He assessed generalized anxiety disorder and right shoulder pain, prescribed Clonazepam
and Cyclobenzaprine, and again recommended physical therapy and counseling. R. 873–74. At a
visit in June, Dr. Carpenter noted "moderate" pain; decreased ROM in right shoulder abduction,
flexion, and extension; tenderness in right anterior shoulder and medial right calf along tendons
into mid dorsal foot; and normal coordination and movement R. 877. He assessed pain in the
right lower leg and right shoulder, prescribed prednisone, and recommended physical therapy. *Id.*

Considering Dr. Carpenter's findings, ALJ Munday reasonably determined that the extreme limitations Dr. Carpenter attributed to Darlene's chronic low back pain and generalized anxiety disorder, R. 658–59, are not supported by his own examination findings. While his examination findings note that Darlene experienced pain, the findings do not support the extreme limitations Dr. Carpenter assessed. Although she consistently reported tenderness in her back and lower extremities and sometimes had decreased ROM in her upper extremities, these findings do not show that Darlene was unable to lift/carry *any* amount of weight and unable to stand/walk or sit for *any* part of the workday, as Dr. Carpenter opined. *Cf. Yolanda A. v. Soc. Sec. Admin.*, No. 3:18cv83, 2020 WL 3117461, at *9 (W.D. Va. Feb. 19, 2020) ("[A] claimant 'does not have to be pain-free in order to be found not disabled,' especially where, as here, the ALJ found she was only capable of 'performing work at a lower exertional level' than she did before her alleged onset date.") (quoting *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011))). Moreover, Dr. Carpenter noted improvement in Darlene's anxiety on several occasions, rarely noted abnormalities in her gait or lower-extremity ROM, and generally observed normal movement and good insight and judgment. These findings conflict with the extreme physical and mental limitations in his medical opinions, and the ALJ reasonably found that Dr. Carpenter's treatment notes did not support his medical opinions.

Additionally, the ALJ determined that Dr. Carpenter's findings were "not supported by an appropriate explanation." R. 32 ("His earlier medical opinions consist of a series of checked boxes on a form. The lines on the form allowing for an explanation are blank, or not supported by an appropriate explanation. In essence, Dr. Carpenter does not explain his medical opinions."). ALJ Munday reasonably concluded that Dr. Carpenter's proposed limitations lacked

supportability from an appropriate explanation. Dr. Carpenter's Physical Assessment form

contained no explanation for his assessment of Darlene's physical limitations. *See* R. 656–57. He

noted a diagnosis of "chronic low back pain/right sciatica," but a diagnosis alone does not

demonstrate any specific functional limitation. *See Felton-Miller v. Astrue*, 459 F. App'x 226,

230 (4th Cir. 2011) ("Felton-Miller's sarcoidosis diagnosis, without more, does not establish that

she suffers from any particular symptoms or limitations."). On the Mental Capacity Assessment

form, Dr. Carpenter explained his findings of Darlene's limitations in understanding,

remembering, or applying information: "losing keys, locks self out of house, puts shirt on

backwards, etc.," but he did not state whether these findings were based on his own observations

or Darlene's subjective reports. Given the nature of Dr. Carpenter's explanation, the ALJ could

reasonably conclude that "he appears to have relied on the subjective report of symptoms and

limitations provided by the claimant, rather than on the objective findings." R. 32. *See Craig*, 76

F.3d at 590–91 & n.2 (noting that "[t]here is nothing objective about a doctor saying, without

more, 'I observed my patient telling me she was in pain[,]'" and finding that "sufficient

evidence" justified ALJ's decision to reject medical source's "conclusory opinion based upon

Craig's subjective reports of pain"). Additionally, his explanation of Darlene's limits in adapting

and managing oneself is explicitly based on her subjective reports rather than the

"medical/clinical findings" that Dr. Carpenter was asked to describe: "*She notes* difficulty with

home tasks, *feels she* needs an aide." R. 659 (emphasis added). His remaining explanations are

conclusory, inconsistent with or not supported by his treatment notes, or based on Darlene's own

reports. *See id.* ("Her anxiety persists to extreme degree, worsened by back pain, poor control

despite meds & counseling."); R. 660 ("Little social interaction, difficulty with relationships,

feels suspicious of others."). Thus, although Dr. Carpenter offered some explanation for his

medical opinions of Darlene's mental limitations the ALJ could reasonably conclude that Dr. Carpenter's opinions lacked an "appropriate explanation," and also lacked support. *See Jones v. Colvin*, No. 0:12-CV-1773-MGL, 2013 WL 4823174, at *5 (D.S.C. Sept. 9, 2013) (noting that "the force of a medical opinion may be diminished when it is offered on a check-the-box form," particularly where the physician provides little to no supporting explanation for the conclusions reached). As such, the ALJ properly found that Dr. Carpenter's medical opinions were not supported by his own treatment notes or on the assessment forms themselves. *See* 20 C.F.R. § 404.1520c(c)(1).

ALJ Munday also discussed the consistency of Dr. Carpenter's medical opinions. The regulations direct that "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2). The ALJ found that Dr. Carpenter's opinions were "not entirely consistent with the other evidence of record." R. 32. She first reasoned that "[n]o other doctors submitted medical opinions indicating the claimant [was] as limited" as Dr. Carpenter opined. *Id.* This finding is factually accurate, *e.g.*, R. 97–99, 116–17, 120, and consistent with the governing regulation, 20 C.F.R. § 404.1520c(b)(3), (c)(3). For instance, with respect to Darlene's physical RFC, while Dr. Carpenter opined that Darlene could not sit, stand, or walk *at all* during the workday, R. 656, the two medical doctors who reviewed Darlene's record for DDS in June and November 2018, respectively, both opined that she could stand/walk and sit for six hours each in an eight-hour workday, R. 97, 116. And, whereas these DDS experts concluded that she could lift/carry twenty pounds occasionally and ten pounds frequently, R. 99, 116, Dr. Carpenter found she was unable to lift any amount of weight at all, R. 656. Further no DDS expert offered a similar opinion as to the high number of absences and need for breaks that

14

Dr. Carpenter attributed to Darlene. *See* R. 656–57. Although some of the DDS psychological experts' findings with respect to Darlene's moderate limitations in her mental RFC are consistent with Dr. Carpenter's findings, neither of those doctors found Darlene had "marked" or "extreme" limitations in any category. *See* R. 659. Moreover, the DDS experts offered detailed explanations for their findings, *see* R. 98–100, 117, 120, whereas Dr. Carpenter merely offered conclusory explanations, many of which appear to be based on Darlene's subjective reports rather than his own objective findings, R. 656–60. Thus, the ALJ reasonably concluded that Dr. Carpenter's medical opinion was inconsistent with the other medical opinions in the record. *See Reese v. Astrue*, No. 7:10cv538, 2012 WL 423630, at *6 (W.D. Va. Jan. 24, 2012) ("Substantial evidence exists in the record to support the ALJ's decision to give Dr. Prokopchak's opinion lesser weight. As the ALJ noted, Dr. Prokopchak's opinion is contrary to all other medical opinion evidence in the record, which indicates that Reese is capable of performing at least a limited range of sedentary work.").

The ALJ also relied on imaging she found inconsistent with the limitations Dr. Carpenter assessed. R. 32. The ALJ noted that Darlene's "December 2015 lumbar radiograph demonstrated "mild anterior osteophytes at L1-L2 through L3-L4 without significant disc height loss at any level within the lumbar spine," and that her "July 2017 cervical CT scan showed moderate disc space narrowing and osteophytes at C5-C6, but was negative for any evidence of acute osseous injury and otherwise entirely normal." *Id.* The ALJ accurately described the imaging studies, *see* R. 333 (December lumbar spine radiograph showing "[n]o acute osseous abnormality"); R. 686–87 (July 2017 cervical spine CT with same impression), and she reasonably concluded that this evidence was inconsistent with the extreme limitations in Dr. Carpenter's opinion. *See Lew M. v. Berryhill*, No. 6:17cv47, 2018 WL 4659258, at *4 (W.D. Va. Aug. 13, 2018) ("Substantial

evidence supports the ALJ's finding that Dr. Dehli's opinion is inconsistent with the objective

medical evidence in the record as well as the ALJ's decision to accord more weight to the

opinion of the state agency medical consultants. . . .").

Moreover, the ALJ's conclusion that Dr. Carpenter's medical opinions were inconsistent

with the other evidence of record is supported by substantial evidence. For example, in addition

to visits with Dr. Carpenter, the evidence during the relevant period demonstrates that Darlene

presented to David Rubendall, D.O., on January 25, 2019, complaining of back pain and right leg

pain. R. 786. He noted she had been using a cane that she had borrowed and she reported that it

helped with balance. R. 788. Examination revealed decreased ROM, tenderness, and pain in the

lumbar spine; normal strength; and normal behavior, mood/affect, judgment and thought content.

R. 790; *see also* R. 784 (same findings on March 18, 2019). Dr. Rubendall recommended a water

therapy program, prescribed a four-point quad cane for gait stability, and ordered a refill of

Ambien. R. 791. Darlene also attended physical therapy ("PT") from February to April 2019. At

a PT visit on February 11, Darlene's gait was noted to be generally stable, with a mild shuffled

pattern with use of a single point cane. R. 710. Pain was noted in her bilateral sacroiliac joints,

along with tightness and pain in her hamstring, poor balance, and nervousness. *Id.* She was

"[t]ender to palpation deep hip flexors. . . , all gluteal and hip rotator muscles, lumbar SP's and

associated paraspinal, inner thighs, adductors." *Id.* On February 25, Darlene reported stiffness

and a slight limp with walking, but said she felt great after her most recent PT visit. R. 717. She

reported hip, leg, foot, and lower back pain, was ambulating with a single point cane, and

reported constant pain and feeling "very anxious." *Id.* The physical therapist's assessment noted,

however, that Darlene was "without SPC today and initially ambulated with antalgic gait

however this improved following today's exercises." R. 718. In March, records noted that she

had made minimal progress with PT. R. 724. She had increasing right leg pain and had a "noticeable limp on R when in clinic but can be observed walking w/ out limp outside of the clinic along sidewalk to her car." *Id.* Darlene was discharged from PT in April 2019, having cancelled several appointments and made minimal progress towards her goals. R. 729.

Darlene presented to MedExpress on May 16, 2019, complaining of a chest injury and limited ROM of her right side after another person hit her in the chest with a weight while she was walking at the gym. R. 861. On exam, Darlene had a contusion on her chest that was tender to palpation, pain with ROM of neck and shoulder, normal gait and stance, spasms along right posterior shoulder into right side of neck, and ecchymosis on right chest. R. 862. Treatment notes do not indicate that she was using a cane. *Id*. On May 22, Dr. Rubendall noted decreased ROM, tenderness and pain in right shoulder, normal strength, and normal behavior, mood/affect, judgment and thought content. R. 773. He did not note any use of a cane and he recommended exercise and prescribed PT and medication. R. 771–73. In July, Darlene reported continued back and leg pain and use of a cane to Dr. Rubendall. R. 886. Darlene's review of systems, however, was negative for a gait problem. R. 887. She demonstrated decreased range of motion, tenderness, and pain in her lumbar back, but all other examination findings were unremarkable. R. 888. Dr. Rubendall continued Darlene's PT and refilled her medications. *Id.*

Considering these mixed findings, the ALJ reasonably determined that the other medical evidence was "inconsistent" with the extreme limitations Dr. Carpenter identified in his medical opinions. Thus, each of the ALJ's reasons support her conclusions that Dr. Carpenter's medical opinions are neither supported by or consistent with his own treatment notes or the other medical evidence in the record. Accordingly, I find that the ALJ's analysis of Dr. Carpenter's medical opinions is supported by substantial evidence

B.    *Evaluation of Cane Use*

Next, Darlene argues that the ALJ erroneously found that her cane was not "medically necessary." Pl.'s Br. 15. She contends that although the ALJ considered her cane use within her RFC analysis, she "failed to thoroughly explain her finding of the use of a cane as not medically necessary." *Id.* She does not challenge the accuracy of the ALJ's assertion that there were "very few instances of [Darlene] using a quad cane on physical exams," but posits that this evidence does not support a finding that her cane was not medically necessary as Darlene did not begin using her cane until January 2019 and the majority of the evidence of record predates that period. *Id.* Darlene then alludes to various pieces of evidence that she claims demonstrate the medical necessity of her cane, including her testimony that she "utilized a cane because of balance and stability issues and subsequently, no longer cooked or grocery shopped" and had to borrow her friend's cane to keep from falling even before being prescribed one herself. *Id.* Further, Darlene notes that her medical provider observed that she had "a wide base of support and a mild shuffled pattern" and that her physical therapist said she required a cane to ambulate in February 2019 and observed her ambulating with a limp while using a cane in February and March of that year. *Id.* at 16.

"Social Security Ruling 96-9p requires an ALJ to consider the impact of medically required hand-held devices, such as a cane or walker, when evaluating the claimant's RFC." *Candi L. v. Comm'r of Soc. Sec.*, No. 4:17cv30, 2018 WL 7690318, at *8 (W.D. Va. July 31, 2018) (internal quotation marks omitted), *adopted*, 2019 WL 1264890, at *3–5 (W.D. Va. Mar. 19, 2019), *and aff'd*, 808 F. App'x 210, 211 (4th Cir. 2020); *see* SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or

18

standing and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7. "The claimant bears the burden to show that her use of a particular hand-held assistive device to perform work-related functions is in fact medically necessary and therefore should have been included in the RFC finding." *Candi L.*, 2018 WL 7690318, at *8.

Darlene has not met her burden here. ALJ Munday acknowledged Darlene's testimony that she began using a single-point cane in January 2019 that she had borrowed from a friend for stability and balance issues. R. 28. She also noted that Darlene had "was prescribed a four-point cane on January 25, 2019, by her pain management specialist" after she had been seen using a single-point cane. R. 29; *see also* R. 788–91. Nonetheless, she found Darlene's four-point cane was "not medically necessary, as her gait was generally normal, and there [were] few instances of [Darlene] using a quad cane on physical exams." *Id.* ALJ Munday also considered other evidence that she found inconsistent with required cane use, including that "it was reported during a March 11, 2019 physical therapy visit that she had a 'noticeable limp on the right when in the clinic but was observed walking without a limp outside of the clinic along the sidewalk to her car.'" R. 30 (cleaned up) (citing R. 724)

Although Darlene was prescribed a four-point quad cane in January 2019 and observed to have gait problems on exam that day, R. 788–91, in March 2019, she was observed walking to her car without a limp after she had been limping during her PT session, R. 724. At other appointments in 2019, Darlene was noted to have a single-point cane on several occasions, R. 710, 866, even though some examination findings noted no gait abnormalities, R. 877. Treatment notes from many other appointments do not document that she used a cane, R. 718, 773, 862.

ALJ Munday explicitly considered much of this evidence. She identified the inconsistencies in the record with respect to Darlene's cane use, and she explained why—with

specific references to the evidence—she found that Darlene's cane use was not "medically necessary." R. 29. It was reasonable of her to reach such a conclusion on the basis of the mixed evidence of record regarding Darlene's cane use. *See Brewer v. Astrue*, No. 5:11cv106, 2012 WL 405090, at *2 (N.D. W. Va. Feb. 8, 2012) ("Although the plaintiff may have been prescribed a cane, this Court finds that there is other evidence in the record indicating that a cane was not medically required and that the plaintiff did not consistently use a cane to walk."). It is not this Court's role to re-weigh the evidence or to substitute its judgment for that of the ALJ. *See Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). To conclude here, based on the same evidence considered by ALJ Munday, that Darlene's cane was medically necessary, would be to do just that.

Moreover, Darlene has failed to point to any "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing *and describing the circumstances* for which it is needed." SSR 96-9p, 1996 WL 374185 (emphasis added). The evidence Darlene alludes to shows only that her cane was prescribed "for gait stability," R. 791, and "to assist w[ith] ambulation," R. 710. The regulations require more than these general descriptions and call for documentation of how often the cane is needed, "whether all the time, periodically, or only in certain situations," the distances and type of terrain for which it is required, and "any other relevant information." SSR 96-9p, 1996 WL 374185. Darlene identifies no statement from a medical provider describing the circumstances in which her cane use is required, and, thus, she has not carried her burden of establishing that a cane was "medically required."

Accordingly, I find that the ALJ's determination that Darlene's cane is not medically required is supported by substantial evidence. *Scott v. Berryhill*, No. 4:17cv42, 2018 WL

4939268, at *4 (E.D.N.C. July 5, 2018) ("Because Scott has failed to carry her burden of

establishing her use of an assistive device was medically required, the undersigned cannot find

that ALJ Hall erred failing to include the use of a cane in her RFC determination for a reduced

range of light work.").

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** the Commissioner's motion for summary judgment, ECF No. 18, **AFFIRM** the

Commissioner's final decision, and **DISMISS** the case from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and
> Recommendation], any party may serve and file written objections to such
> proposed findings and recommendations as provided by rules of court. A judge of
> the court shall make a de novo determination of those portions of the report or
> specified proposed findings or recommendations to which objection is made. A
> judge of the court may accept, reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge may also receive further
> evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within

14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of

record.

ENTER: February 28, 2022

Joel C. Hoppe
United States Magistrate Judge

21